LEWIS E. STARRY, Appellant, v. STARRY & LYNCH et al., Appellees.

No. 40607.

January 13, 1931.

Rehearing Denied April 11, 1931.

James W. Wilson, Charles O. Holly, and J. E. Remley, for appellant.

Park Chamberlain and Donnelly & Lynch, for appellees.

Evans, J.—The case was before us on a former appeal, 208 Iowa 228. This was an appeal by the defendant from a judgment rendered against him. The case was remanded for a new trial upon reversal here. None of the material questions now presented, were considered or involved in that appeal.

The note in suit is for $17,000. It was given in July, 1920, as a part of the purchase price of the plaintiff's interest in his father's estate. Such interest was conveyed by him to his brother, Wilbert Starry, defendant herein.

It appears that on July 22, 1920, Lewis Starry, Sr., a resident of Olin in Jones County, died intestate and left surviving him his widow, Mary, and his two sons, Lewis and Wilbert, parties hereto, and a granddaughter, Mrs. Edith Starry Hoff, the only child of a deceased son. His estate comprised an unencumbered farm of 294 acres in Jones County, and his residence property in Olin, and about $7000 in moneys and credits. At the time of his death, his son Lewis was a resident of Milford, Dickinson County, Iowa, and Mrs. Hoff a resident of Minneapolis. Wilbert was a resident of Jones County. Both Lewis and Mrs. Hoff were present at the time of Starry Sr.'s death and at the time of his funeral. Following the funeral some negotiations were had as between Wilbert on the one hand and

the other heirs and the widow on the other, which resulted in the acquisition by Wilbert of all the estate of his father. Pursuant to these negotiations Lewis was to receive the sum of $25,000 for his interest therein. This consideration was received by Lewis in the form of two notes of $8000 and $17,000 respectively, and both of them signed:

"Starry & Lynch
        Wilbert Starry
        Glenn Lynch"

While these negotiations were pending, certain negotiations were had also between Wilbert Starry and Glenn Lynch, who was his son-in-law and who was cashier of the bank of Olin. These latter negotiations contemplated the acquisition of an interest by Lynch, jointly with his father-in-law, in the property thus to be purchased. As claimed by plaintiff, it was because of, and pursuant to, these negotiations that Lynch signed the notes with his father-in-law. The venture, made in the fateful year of 1920, proved of course disastrous. No benefit was ever realized therefrom by Lynch, nor by Wilbert,—the farm having been wholly lost to both of them. It is not claimed that the failure of the venture destroyed the consideration for the notes. The theory of defense put forward by defendant Lynch is that defendant Wilbert Starry had a *pre-existing* binding contract with Lewis Starry, whereby Lewis Starry had bound himself to accept the note of Wilbert alone and that therefore the signature of Glenn Lynch was without any consideration. This theory of defense rests upon certain testimony of Wilbert, concerning a conversation with Lewis Starry to be hereinafter set forth.

The case was submitted to the jury on the theory, that if this conversation in substance was proved to their satisfaction, the defendant was entitled to a verdict.

While it is true, as contended by appellee, that we must accept the evidence in the most favorable light to the defendant, and must accept the evidence of Wilbert rather than that of Lewis where there is conflict between them, yet we find it impossible to interpret some of the evidence of Wilbert except in the light of the testimony of Lewis. This is so because some of the testimony of Lewis is undenied and the story of Wilbert

standing alone is incomplete. Lewis testified that the negotiations began after the funeral and in the home of the mother and were participated in by the two sons, the mother, and the granddaughter; that he named the price of $25,000 for his interest, which was objected to by Wilbert as excessive; that Wilbert said that Glenn Lynch would be interested in the purchase, if he made it, and suggested that they go to the bank and confer with Lynch; that both brothers went to the bank and conferred with Lynch; that as a result. of the conference his price was acceded to and he was to have $8000 on the first of March following and time was to be given on the balance. It does not appear what the length of such time was to be except as it later appeared in the notes executed. Thereupon Wilbert and Lewis went to Anamosa, the county seat, to the office of Gorman, an attorney, and employed Gorman to prepare the necessary papers. Such papers were prepared by Gorman and were taken by the brothers. They comprised the purported notes to Lewis and to Mrs. Hoff for their respective interests; a paper to be signed by Lewis and by Mrs. Hoff and by the widow purporting to be a general assignment of all the interests of the signers in the estate of the decedent; a petition for the appointment of Wilbert as administrator; a waiver to be signed by the widow waiving her right to appointment as administratrix. Each and all these papers were finally executed pursuant to the negotiations. Each and all of the papers thus executed were delivered respectively to the parties for whom they were intended. Lewis and Mrs. Hoff received their purchase-money notes, all of which were signed by Wilbert Starry and by Glenn Lynch in the same manner and form as the note in suit.

At the close of the evidence the plaintiff moved for a directed verdict on the broad ground that the defendant had failed to prove a want of consideration for his signature; and on the further ground that it was made to appear affirmatively that there was consideration for the signature.

The record discloses two phases of the evidence,—one negative and the other affirmative. Each is fundamental herein. Though these are parts of the same thing, the evidence relating to each is somewhat distinct and for convenience of discussion, we will deal with them separately.

I. Did the defendant affirmatively prove want of con-

sideration? The theory of this affirmative defense, has already been referred to. It was that Lewis Starry had bound himself by a pre-existing contract to accept the note of Wilbert Starry alone for the purchase price. The testimony relied on in support of the theory is that of the defendant Wilbert Starry, as a witness. He testified that in the course of negotiations between him and Lewis, the following conversation occurred:

"Well, he said I had better buy his interest—he lived up north—I was here and could look after it; I asked him how much he would take and he said $25,000.00. I asked him how much he would give—he said he didn't live here and didn't want it—I told him I couldn't give him that much money; he said well if he could have $8,000.00 by the first of March he would take my note for the balance. I told him I would do it."

He testified also that this conversation occurred while they were riding together from Olin to Anamosa on their way to consult attorney Gorman about the affairs of the estate. The foregoing comprises the only affirmative evidence introduced in support of this theory of the defense. Lynch testified negatively and broadly that he had no interest in the transaction and received no benefit therefrom.

Authorities relied on in support of the defense are Hinman v. Treinen, 196 Iowa 701; Le Fleur v. Caldwell, 196 Iowa 727; Insell v. McDaniels, 201 Iowa 533.

The question then at this point is, does the case at bar come within the purview of the cited cases? Each of those cases was one of the suretyship of the wife for the debt of her husband. In each case the liability of the husband did not arise contemporaneously with the signing of the wife. In each case the note in question was given in performance of a prior executory written contract. In each case such prior executory written contract defined the rights and liabilities of the parties thereto. In each case the wife was not a party to such prior existing contract and the obligation imposed therein upon her husband provided for performance by him alone. In those cases we held that the signature of the husband to the note in question operated as a full performance of the executory contract previously existing.

It is the general rule of law that where a contract has the

support of a consideration, such consideration is applicable to every original party thereto. For instance a surety does not usually obtain consideration or benefit to himself, but he is nevertheless bound to the consideration inhering in the transaction as between the principals. To that general rule we have recognized an exception in the cited cases. It is an exception, which has not been largely recognized in other jurisdictions. An exception to a general rule of law, is to be carefully applied within strict lines, lest by its expansion it destroy the rule itself.

In the case before us, there was no *prior* contract in force between Lewis and Wilbert. The only contract was the one consummated by the delivery of the note. No executory contract was entered into or contemplated. The negotiations between them contemplated a complete consummation of whatever agreement they might reach. Statements or offers made by either in the course of negotiations, were tentative in a legal sense and did not become binding until a complete agreement was reached and consummated by the execution and delivery of the writings contemplated by the negotiations. It is frequently true that contracting parties change their minds in the course of negotiations and before the consummation of the contract, and this they have a legal right to do. We have held that negotiations for the purchase of land may not be treated by the purchaser as terminated by his acceptance of an offered price. Notwithstanding such acceptance, other material details will keep the contract open and agreement thereon must be reached in order to render the contract binding. In Kinman v. Botts, 147 Iowa 474, we said:

"The correspondence between Leach and defendant was solely as to the price which defendant would take for his farm; and no terms of sale other than as to the price were specifically referred to, although Leach advised defendant that the farm had depreciated during his absence from it, in that the improvements had been allowed to become in bad condition * * *. Now, the sole question to be determined in this case is whether these telegrams concluded a binding contract of sale, in view of the circumstances, so far as they were known to both parties, between plaintiff, the undisclosed prospective purchaser, and defendant. It is a matter of common knowledge that executory contracts for the sale of real property usually contain terms

as to the time of payment of the consideration in a lump sum or by installments, the time of surrender of possession, the payment of the expense of furnishing an abstract, and similar matters. While it is true that an unequivocal present agreement of sale of specific property for a definite price would be valid without statement as to other conditions, all of which would, in such event, be determined by recognized rules of law, nevertheless we think the universally known usage to state such terms in a written contract may be taken into account, where the language of the writings relied upon to constitute a contract leaves room for doubt as to whether the parties intended and understood that such writings should constitute a complete and binding contract of sale.''

In Petersen v. Jensen, 189 Iowa 400 (407), we said:

''The negotiations leading up to such contract, through successive agreements, should be deemed open, until it can be said that the parties themselves, either by language or conduct, mutually closed them. A completed sale is not attained by the mere snapping of the finger by one of the parties, after an agreement upon the price.''

In the case at hand there was no *prior* contract; no prior indebtedness or obligation. The only contract in existence was that of which the note in suit formed a part. It had no antecedent executory contract. It was preceded by nothing but its own negotiations, all of which were merged in the final consummation, as evidenced by the instruments executed and delivered. Statements made in the course of negotiation were not *contracts,* nor did they become binding at any stage of the negotiations preceding the consummation of the contract in its entirety.

It is apparent therefore that the evidence in the case does not bring it within our holdings in the cited authorities. Concededly the parties contemplated the consummation of their contract by written instruments. All such instruments were executed and delivered. One of such instruments was the note in suit. In the absence of fraud or mistake, such written instruments became the conclusive evidence of the contract. There is no claim of fraud or mistake. The note in suit was executed and delivered in purported consummation of the contract. It

was accepted as such. It had a lawful consideration. Under the general rule, such consideration operated upon all the contemporaneous signers thereof. The case is not within the exception to such general rule. If we were to hold that the exception contended for, applied to a case of indebtedness presently created, as well as to a case of previous indebtedness, and of previous executory contract, we should be enlarging the exception to the ousting of the general rule. Its effect would be to say that any surety or co-maker of a note, without tendering any issue of fraud or mistake, could contradict the plain terms of the instrument upon which his signature appeared.

We reach the conclusion therefore that the evidence clearly failed to bring the case within the scope of the cited authorities and failed to show a want of consideration. In other words the obligation of each signer became effective at the same time. The obligation of neither preceded that of the other. The consideration of the contract became operative upon both parties simultaneously.

II. The second phase of the evidence relates to the question whether Lynch had an interest either actual or potential in the contract and in the subject matter thereof. Concededly Wilbert and Lynch had had some negotiations together looking to a joint venture between them on this transaction. They testified however that the talk was ''loose'' and ''indefinite'' and that no definite agreement had been reached; nor the extent of the interest, if any, determined. It was because of these negotiations that Wilbert Starry signed the name ''Starry & Lynch'' as the first signer on the note. Underneath this purported signature he signed his own name. Following him the defendant Lynch attached his name thereto. On this subject Lynch testified as follows:

''Wilbert Starry and I had talked some—he came in the bank and told me to sign the note. and I signed it. He said Lewis was going away.'' * * *

''I signed the note after the little talk I have referred to in reference to the possibility of my acquiring an interest in the estate. This talk was about the time when Lewis and Wilbert were at Gorman's office and before Lewis went to his home.'' * * *

''Isn't it true, as just stated here, that you signed the note

in question here now in suit on account of your reliance on some talk you had had with Wilbert Starry as to some interest he was to let you have in the estate of Lewis E. Starry? A. That was one of the reasons I signed the note at that time."

The cross examination on this subject was quite extensive. The foregoing sufficiently summarizes it. It is clear from the foregoing that Lynch signed the note as a prospective participant in the enterprise. Whether his prospect was large or small, is quite immaterial on the question of consideration. All of the consideration moving to Lewis and to Mrs. Hoff was represented by notes and each of them was signed in the form above indicated. The testimony of Wilbert on this subject is in line with that of Lynch. His explanation of why he signed the name "Starry and Lynch" to the notes is that it was done because of the "loose" talk between him and Lynch as to Lynch's prospective interest in the transaction. As a matter of law the signing of these notes by Lynch, under this understanding, however loose and indefinite it was, presumptively impressed upon the property a resulting trust in his favor. By signing the note pursuant to the negotiations between him and Wilbert, he did as a matter of law, acquire an interest in the contract. With the consent and procurement of Wilbert, and of Lewis, and of Mrs. Hoff, Lynch did make himself a party to the contract. And this fact is made to appear from his own testimony and from the testimony of Wilbert, as a witness in his behalf. Such fact appears not only from his direct testimony, but is much emphasized by the circumstances. A very significant circumstance was the signing of the name "Starry and Lynch". This was done by Wilbert with the knowledge and consent of Lynch. True, there was no such entity, and the signature was inoperative as against any other entity than the individuals themselves. But the force of the circumstance is not thereby lost. It indicated unmistakably that they were jointly interested in the venture. And such in effect is the only explanation offered for the use of such signature.

We see no escape from saying that this testimony emanating from the defendant, as witness, clearly disclosed an interest to some extent of the defendant Lynch in the enterprise. Whether great or small, actual or potential, it was sufficient to constitute

a legal consideration and to make this defendant a co-party to the transaction.

Upon this state of the record it must therefore be held that the verdict of the jury lacked support in the evidence and was clearly contrary to the evidence. Other questions need not be considered.

The judgment below is accordingly reversed.

FAVILLE, C. J., and STEVENS, DE GRAFF, ALBERT, MORLING, and KINDIG, JJ., concur.